United States Bankruptcy Court

Eastern District of Pennsylvania

| | |
|---|---|
| In re: | Case No. 20-12591-elf |
| Edith M. Chew | Chapter 13 |
| Debtor | |

# CERTIFICATE OF NOTICE

| | | |
|---|---|---|
| District/off: 0313-2 | User: admin | Page 1 of 2 |
| Date Rcvd: Apr 16, 2021 | Form ID: pdf900 | Total Noticed: 1 |

The following symbols are used throughout this certificate:
**Symbol    Definition**

+          Addresses marked '+' were corrected by inserting the ZIP, adding the last four digits to complete the zip +4, or replacing an incorrect ZIP. USPS regulations require that automation-compatible mail display the correct ZIP.

**Notice by first class mail was sent to the following persons/entities by the Bankruptcy Noticing Center on Apr 18, 2021:**

| Recip ID | Recipient Name and Address |
|---|---|
| db | + Edith M. Chew, 206 Gulph Creek Road, Wayne, PA 19087-4502 |

TOTAL: 1

**Notice by electronic transmission was sent to the following persons/entities by the Bankruptcy Noticing Center.**
Electronic transmission includes sending notices via email (Email/text and Email/PDF), and electronic data interchange (EDI).

NONE

# BYPASSED RECIPIENTS

**The following addresses were not sent this bankruptcy notice due to an undeliverable address, *duplicate of an address listed above, *P duplicate of a preferred address, or ## out of date forwarding orders with USPS.**

NONE

# NOTICE CERTIFICATION

I, Joseph Speetjens, declare under the penalty of perjury that I have sent the attached document to the above listed entities in the manner shown, and prepared the Certificate of Notice and that it is true and correct to the best of my information and belief.

**Meeting of Creditor Notices only (Official Form 309): Pursuant to Fed .R. Bank. P.2002(a)(1), a notice containing the complete Social Security Number (SSN) of the debtor(s) was furnished to all parties listed. This official court copy contains the redacted SSN as required by the bankruptcy rules and the Judiciary's privacy policies.**

| | | |
|---|---|---|
| Date: Apr 18, 2021 | Signature: | /s/Joseph Speetjens |

---

# CM/ECF NOTICE OF ELECTRONIC FILING

The following persons/entities were sent notice through the court's CM/ECF electronic mail (Email) system on April 15, 2021 at the address(es) listed below:

| Name | Email Address |
|---|---|
| CHARLES GRIFFIN WOHLRAB | on behalf of Creditor Newrez LLC D/B/A Shellpoint Mortgage Servicing cwohlrab@raslg.com |
| CHARLES GRIFFIN WOHLRAB | on behalf of Creditor Newrez LLC cwohlrab@raslg.com |
| CHARLES GRIFFIN WOHLRAB | on behalf of Creditor USAA Federal Savings Bank cwohlrab@raslg.com |
| DAVID A. SCHOLL | on behalf of Debtor Edith M. Chew judgescholl@gmail.com |
| DAVID A. SCHOLL | on behalf of Plaintiff Edith M. Chew judgescholl@gmail.com |
| JEROME B. BLANK | on behalf of Creditor Newrez LLC D/B/A Shellpoint Mortgage Servicing paeb@fedphe.com |

District/off: 0313-2 | User: admin | Page 2 of 2
Date Rcvd: Apr 16, 2021 | Form ID: pdf900 | Total Noticed: 1

REBECCA ANN SOLARZ
 on behalf of Creditor Newrez LLC D/B/A Shellpoint Mortgage Servicing bkgroup@kmllawgroup.com

REBECCA K. MCDOWELL
 on behalf of Creditor SANTANDER BANK  N.A. rmcdowell@slgcollect.com, pwirth@slgcollect.com

THOMAS YOUNG.HAE SONG
 on behalf of Creditor Newrez LLC D/B/A Shellpoint Mortgage Servicing paeb@fedphe.com

United States Trustee
 USTPRegion03.PH.ECF@usdoj.gov

WILLIAM C. MILLER, Esq.
 on behalf of Trustee WILLIAM C. MILLER  Esq. ecfemails@ph13trustee.com, philaecf@gmail.com

WILLIAM C. MILLER, Esq.
 ecfemails@ph13trustee.com  philaecf@gmail.com

TOTAL: 12

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

IN RE:    EDITH M. CHEW,    :    Chapter 13
                            :
          Debtor.           :    Bky. No. 20-12591 ELF
                            :

# M E M O R A N D U M

## I.  INTRODUCTION

Debtor Edith Chew commenced this chapter 13 bankruptcy case on June 10, 2020.

On July 27, 2021, New Rez LLC, d/b/a Shellpoint Mortgage Servicing ("New Rez") filed a secured proof of claim ("the POC"). New Rez asserted a total claim of $169,475.60, with prepetition arrears of $20,370.85 ("the Arrears Claim"). The total claim and the Arrears Claim are secured by a mortgage ("the Mortgage") on the Debtor's residence, 206 Gulph Creek Road, Wayne, PA 19087.

The Debtor has filed a chapter 13 plan in which she proposes to cure the prepetition arrears on the Mortgage. See 11 U.S.C. §1322(b)(5).

On September 24, 2020, the Debtor filed an objection to the POC ("the Objection").

The Debtor asserts that the Arrears Claim impermissibly includes amounts for "escrow deficiency for funds advanced" and for a "projected escrow shortage". The Debtor also contends that an attorney's fee charge of $450.00, included in the prepetition arrears should be disallowed.. Accordingly, the Debtor requests that the prepetition arrears be allowed in the amount of $16,101.45.

For the reasons set forth below, the Objection will be overruled.

-1-

## II. LEGAL STANDARD: THE SHIFTING BURDENS IN CLAIMS OBJECTION CONTESTED MATTERS

Under the Bankruptcy Code, a proof of claim "is deemed allowed, unless a party in interest ... objects." 11 U.S.C. § 502(a). If there is an objection, the parties' shiftng burdens play a key role in the determination whether the claim will be allowed.

The Federal Rules of Bankruptcy Procedure provide that a proof of claim filed in accordance with the rules establishes the prima facie validity of the claim. See Fed. R. Bankr. P. 3001(f). When a claim is filed in accordance with Rule 3001(f) and alleges facts sufficient to support the legal liability asserted, the claimant's initial obligation to go forward and burden of proof are satisfied. See In re Allegheny Int'l, Inc., 954 F.2d 167, 173–74 (3d Cir. 1992); In re Henry, 546 B.R. 633, 634–35 (Bankr. E.D. Pa. 2016). Thus, a proof of claim conforming to the rules of court serves as both a pleading and as trial evidence, even in the face of an objection to the claim. E.g., In re Sacko, 394 B.R. 90, 100-01 (Bankr. E.D. Pa. 2008); see also In re O'Brien, 440 B.R. 654, 664 & n.14–15 (Bankr. E.D. Pa. 2010).

Once the claimant has made out a prima facie claim, the burden of production shifts to the objector to negate the claim's prima facie validity. The objector must offer evidence that refutes at least one of the allegations essential to the claim's legal sufficiency to meet that burden of production. If the objector fails to do so, the claim will be allowed. However, the ultimate burden of persuasion rests with the claimant. See, e.g., Henry, 546 B.R. at 634–35.

## III. FACTS

The Debtor has not questioned that New Rez's POC complied with the requirements of

-2-

Fed. R. Bankr. P. 3001. Therefore, I will consider the information contained in the POC as trial evidence. Att the hearing on the Objection, New Rez offered no other evidence and relied entirely on the information included in the POC.

New Rez's attached to the POC

- the Mortgage Proof of Claim Attachment ("the POC Attachment");

- an Annual Escrow Account Disclosure Statement - Account History ("the Escrow History");

- an Annual Escrow Account Disclosure Statement dated June 10, 2020 ("the Escrow Analysis");[1]

- the Note;

- the Mortgage; and

- a mortgage assignment.

The POC Attachment itemized the components of the Arrears Claim and also included a loan history ("the Loan History") as supporting evidence.

New Rez itemized its claim for prepetition mortgage arrears as follows:

| | |
|---|---|
| **Principal & interest due:** | $9,865.10 |
| **Prepetition fees due:** | $450.00 |
| **Escrow deficiency for funds advanced:** | $4,639.38 |
| **Projected escrow shortage:** | $6,866.81 |
| **Less funds on hand** | ($1,450.44) |
| **Total prepetition arrearage:** | $20,370.85 |

---

[1] Both the POC Attachment and the Escrow Analysis are required by Fed. R. Bankr. P. 3001(c)(2)(C)

The Loan History included in the POC Attachment runs from the inception of the Debtor's default in June 2019 through June 2020, the month the Debtor commenced this bankruptcy case (hereafter "Default Time Period").

The Loan History shows that during the Default Time Period, $23,378.13 in instalment payments fell due in varying monthly amounts as follows: four (4) payments of $1,818.08, two (2) payments of $1,791.23 and seven (7) payments of $1,789.05.

As for payments, the Loan History shows that the Debtor made five (5) payments in varying amounts between June 30, 2019 and February 28, 2020, totaling $6,904.68. Thus, according to the Loan History, the prepetition delinquency, without consideration of legal fees, escrow deficiencies or escrow shortages was $16,473.45 ($23,378.13 minus $6,904.68).

The Debtor's testimony was largely consistent with the POC. She acknowledged that she was nine (9) months delinquent when she filed this bankruptcy case. Believing her monthly payment to be $1,789.05 (and multiplying it by 9), she testified that she believed that her prepetition delinquency is $16,101.45, an amount fairly close to the $16,473.45 suggested by the POC.

The Debtor expressed no understanding of the additional amounts included in the POC for escrow deficiencies and shortages or why she is responsible for those sums.[2] She also

---

[2] There is no dispute that the Mortgage obligates the Debtor to supplement her loan payments by paying into an escrow account to be used to pay property taxes and hazard insurance.

Section 3 of the Mortgage provides:

> Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is fully paid, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property
> (continued...)

-4-

explained that she understood that New Rez's claim included $450.00 in attorney's fees incurred during her prior bankruptcy case for the filing of a motion for court approval of a loan modification that the parties entered into during the course of that case. She stated that she never agreed to pay that charge.

### IV.  TREATMENT OF MORTGAGE ESCROW
### IN CALCULATING PREPETITION BANKRUPTCY ARREARS

The dispute between New Rez and the Debtor is based primarily on New Rez's inclusion of escrow deficiencies and escrow shortages in calculating the prepetition mortgage arrears.

To properly determine the scope and allowability of the Debtor's prepetition escrow obligation on her mortgage payments, it is necessary to consider the requirements of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601–2617 (and Regulation X thereunder) and the Third Circuit's decision in In re Rodriguez, 629 F.3d 136 (3d Cir. 2010).

#### A.  RESPA

RESPA and Regulation X regulate the administration of federally related mortgage escrow accounts, such as the escrow account required by Section 3 of the Mortgage in this case.

In relevant part, Regulation X provides:

> Throughout the life of an escrow account, the servicer may charge the borrower a

---

$^2$(...continued)
   . . . (c) premiums for any and all insurance required by the Lender under Section 5 . . . .  These items are called "Escrow Items."

Section 5 of the Mortgage requires the Debtor to obtain insurance against loss by fire or other hazards.

-5-

> monthly sum equal to one-twelfth ( 1/12 ) of the total annual escrow payments which the servicer reasonably anticipates paying from the account. In addition, the servicer may add an amount to maintain a cushion no greater than one-sixth (1/6 ) of the estimated total annual payments from the account.

12 C.F.R. §1024.17(c)(1)(i); accord 12 U.S.C. §2609(a).

Thus, Regulation X provides that the escrow component of a borrower's monthly mortgage payment may be calculated to provide that the yearly sum of the escrow payments are sufficient to pay the expected escrow disbursements over the coming year.

Regulation X also entitles the lender to require that the borrower maintain a cushion in the account, limited to one-sixth of the estimated total annual payments from the account. Id. The lender may establish to establish the cushion at the beginning of the loan.  Upon creation of fan escrow account, lenders may charge an initial amount to be paid into the escrow account such that the escrow account balance will not fall below the one-sixth cushion during the upcoming twelve (12) months,.  12 C.F. R. §1024.17(c)(1)(i); see also Heller v. First Town Mortg. Corp., 1998 WL 614197, at *4 (S.D.N.Y. Sept. 14, 1998) (a lender is permitted to require an initial escrow balance that is sufficient to "guarantee the account will not dip below zero in any month" and then add this to the one-sixth cushion).

Three  (3) definitions in Regulation X also are important in understanding a borrowers escrow payment obligations in a federally related mortgage loan.

A "target balance" means the month-end balance in an escrow account that is sufficient to cover the remaining computation year's disbursements, taking into account the remaining periodic escrow payments and the lender's permitted cushion. 12 C.F.R. §1024.17(b).  A target balance can thus fluctuate by month.  Assuming the lender has selected to maintain the one-sixth

-6-

cushion, the target balance represents the amount necessary at any particular month – assuming regular ongoing escrow payments and known disbursements – to keep the account's minimum balance at the level of the cushion over the course of the computation year.

An escrow "deficiency" is "the amount of a negative balance in an escrow account," Id. In other words, an escrow "deficiency" represents the amount of escrow disbursements made by the lender after all of the available escrow funds have been exhausted.

An escrow "shortage" is "an amount by which a current escrow account balance falls short of the target balance at the time of escrow analysis." Id. An escrow shortage arises when a lender projects the necessary disbursements in the upcoming year, compares it to the current balance in the escrow account and the projected future monthly escrow payments and determines that the present and future escrow funds will be insufficient to pay the expected disbursements or there will be point in time where the escrow account will fall below zero.

Under this regulated system, the timing of the expected escrow disbursements can have a major impact on the determination whether an escrow shortage exists.

Consider the following example:

- lender performs an escrow analysis in January;

- the escrow account has $600.00 at that time

- the borrower is supposed to pay $200.00 per month in the escrow account, but failed to pay three (3) monthly escrow payments prior to the escrow analysis;

- a real estate tax payment of $1,200 will be disbursed in March

- a hazard insurance premium of $1,200.00 will be disbursed in December;

- the lender has opted to maintain the one-sixth cushion permitted by Regulation X, which in this example, is $400.00.

-7-

Since the homeowner has been paying $2,400.00 per year (at $200.00 per month) into the escrow account, he/she would pay an amount into escrow sufficient to pay the two (2) disbursements expected in the upcoming year. In addition, as of January, the homeowner has $600.00 in the escrow account, so the January escrow balance exceeds the one-sixth cushion that the lender has opted to maintain.

However, this January escrow balance falls short of that month's target balance. In March, when the $1,200.00 real estate tax disbursement will be made, the homeowner's escrow account balance will be only $1,000.00 ($600.00 already in the account as of January, plus the February and March escrow payments). Payment of the real estate taxes would bring the escrow account below zero (to minus $200.00).

In anticipation of future payments and disbursements, therefore, as of January, there is an escrow shortage of $600.00. An additional one-time payment of $600.00 would make up for the borrower's missed three (3) payments in October, November, and December and would bring the escrow account current and back to the target balance. The $600.00 payment would add to the $600.00 existing balance and the two (2) upcoming $200.00 payments in February and March, bringing the escrow account to $1,600.00 in March. Thus, after the March real estate tax disbursement of $1,200.00, the account would have a positive balance of $400.00, maintaining the one-sixth cushion authorized by Regulation X.

With these principles regarding the administration of federally related mortgage escrow accounts in mind, I now consider how a debtor's escrow obligations affects the determination of allowed prepetition arrears in a chapter 13 bankruptcy case.

-8-

### A. *In re Rodriguez*

The Third Circuit has spoken definitively on the treatment of mortgage escrow in chapter 13 cases. See In re Rodriguez, 629 F.3d 136 (3d Cir. 2010).

In Rodriguez, the debtors were $20,844.40 behind on their mortgage payments, representing eight (8) monthly instalments. Of that sum, $5,657.60 represented the total escrow component of the debtors' missed monthly payments. During the default period, the lender disbursed $3,869.91. Thus, if the debtors had made their payments, there would have been $1,797.69 in the escrow account. Of course, because the payments were not made, the lender made escrow advances for which it had not been reimbursed by the debtors via the component of their monthly payments. See 629 F.3d at 137.

After the bankruptcy was filed, the lender did an escrow analysis in which it assumed that the debtor had $0.00 in the escrow account (as opposed to the $1,789.69 that would have been on account if the debtors were current in their mortgage payments). Id. Based on that assumption, the lender filed a proof of claim for the $3,869.91 it had actually paid prepetition for escrow items, but not the $1,789.69 the debtors should have paid into their escrow account.. Instead, the lender proposed to increase the debtors' future monthly escrow to recover the $1,789.69, as would be permissible outside of a bankruptcy case pursuant to RESPA and Regulation X thereunder,

The practical effect of the lender's action was that it sought reimbursement of the escrow shortage in a twelve (12) month period rather than permitting the debtor to pay the $1,780.69 through a chapter 13 plan to cure the arrears over a thirty-six (36) month or sixty (60) month period.

The Rodriguez debtors argued that escrow shortage attributable to their failure to pay all

-9-

of the prepetition monthly instalments was a prepetition debt that was amenable to being cured in their chapter 13 plan and that the lender's demand for payment by increasing the debtors' monthly escrow payment violated the automatic stay, 11 U.S.C. §362(a).

The Third Circuit panel agreed with the debtors, holding that the escrow shortage was a prepetition debt. In doing so, the court relied on the broad definition of "claim" under the Bankruptcy Code, see 11 U.S.C. §101(5) and the existence of a contractual provisions that required the debtors to pay the sums that comprised the escrow shortage (with their failure to do constituting a default that would support foreclosure). Id. at 138-42. The court remanded the case to the bankruptcy court to consider whether the lender wilfully violated the automatic stay, see 11 U.S.C. §362(k), and what relief if any would be appropriate.

While Rodriguez arose in the context of a claimed violation of the automatic stay, it nonetheless provides two (2) clear, binding guideposts on how to analyze the treatment of a debtor's contractual, escrow obligation in determining the amount of a mortgagee's allowed secured claim for prepetition arrears:

1. Escrow shortages that exist as of the commencement of a chapter 13 case are allowable prepetition claims that may be treated in a chapter 13 plan under 11 U.S.C. §1322(b)(5); and

2. In an escrow analysis effective on the date of the bankruptcy filing, the lender must take into account (and give the debtor credit) for the escrow component of the unpaid monthly instalments that fell due prepetition because those are prepetition debts that will be repaid as part of the lender's claim for prepetition mortgage arrears.[3]

---

[3] The dissent in Rodriguez acknowledges the second point made above in the text

> Debtors contend that in projecting the twelve month summary balance of the Debtors' escrow account, [the lender] should not have started at zero, but rather should have calculated the lowest projected escrow balance as if the Debtors had
> (continued...)

-10-

## V. DISCUSSION

After Rodriguez, there is no doubt that New Rez is entitled to include an escrow deficiency and an escrow shortage in its Arrears Claim. The question is whether the POC and all of the supporting information support New Rez's contention that between unpaid prepetition principal and interest and an escrow deficiency and escrow shortfall, the total prepetition claim for arrears is $20,370.85, as claimed.

Based on my review of the POC and the supporting data, I conclude that the Arrears Claim is accurate and should be allowed.

### A. Escrow

In calculating its prepetition arrears, New Rez followed the format provided in the Official Form, POC Attachment. Unlike the approach I employed in Part III, i.e., simply comparing the accumulation of missed monthly instalments to the payments received, the Official Form drills down one (1) level and requires a claimant to itemize the delinquency in terms of delinquent unpaid principal and interest, delinquent escrow (both deficiency and shortage) and other unpaid charges for which the debtor is responsible..

Below, I will show how New Rez determined each of the itemized components (other than the $450.00 attorney's fees, which will be discussed later) and why its calculation is

---

[3](...continued)
        made the requisite pre-petition monthly payments.

        Of course, the Debtors never made those payments, and it made little sense to credit them for payments never made..

629 F.3d at 145 (3d Cir. 2010) (Sloviter, J., dissenting) (quotations and citations omitted).

accurate.

### 1. unpaid principal and interest ($9,865.10)

The POC attachment states that the principal and interest component of each of the thirteen (13) payments in default is $986.51. This totals $12,824.63. From the $6,904.68 in payments the Debtor made during the Default Time Period, New Rez applied $2,959.53 to unpaid principal and interest. This results in unpaid principal and interest of $9,865.10, the amount itemized in the POC.[4]

### 2. escrow deficiency ($4,639.38)

As explained above, Regulation X defines an escrow "deficiency" as "the amount of a negative balance in an escrow account." 12 C.F.R. §1024.17(b). Or in other words, an escrow "deficiency" represents the amount of escrow disbursements made by the lender after all of the available escrow funds have been exhausted.

The Loan History supports New Rez's calculation of the Debtor's escrow deficiency.

The escrow account had a balance of $0.00 in June of 2019. From that time until the Debtor's petition in June 2020, New Rez applied three (3) separate portions ($831.57 each) of the Debtor's payments to her escrow account, for a total of $2,494.71. During this same period, New

---

[4] It is unclear why New Rez did not apply all of the payments to principal and interest. The Mortgage provides that payments are to be applied to principal and interest before being applied to escrow. (Mortgage §2). But no matter. Dollars are fungible. New Rez's application of some of the Debtor's payments to her escrow obligation, rather than to principal and interest, has no effect on the determination of the amount of allowable prepetition arrears.

-12-

Rez disbursed $7,134.09 from the escrow account for payment of real estate taxes.

Thus, at the time the Debtor filed her petition, her escrow account had a negative balance of $4,639.38. This is the amount claimed by New Rez in the Loan History as the escrow deficiency. The Debtor does not dispute this portion of the POC, but even if she had, I find that the evidence supports New Rez's calculation of the escrow deficiency.

### 3. escrow shortage($6,866.81)

The Debtor disputes the POC's calculation of the escrow shortage, primarily asserting that the POC does not explain how such a shortage was calculated. I find this challenge unavailing, as the attached Escrow Analysis comports with Regulation X and New Rez's rights under the mortgage, and accurately calculates the Debtor's prepetition escrow shortage.

The accuracy of the escrow shortage claimed by New Rez is most easily demonstrated by reproducing the operative section of the Escrow Analysis, which I have attached to this Memorandum as an Appendix.

The Escrow Analysis shows how the escrow shortage – $6,866.81 – is the required initial amount to keep the account at the one-sixth cushion New Rez has opted to maintain. Without the $6,866.81 shortage amount being added to the starting balance of $0.00, the escrow account would go negative in July and August 2020, when two (2) real estate tax payments are made. Also, the analysis shows that if the escrow shortage were made up by an immediate payment of $6,866.81, after the August disbursement, the account will reach its lowest balance ($1,496.02),

which is the one-sixth cushion for the expected annual escrow obligation of $8,976.12.[5] In both respects, the Escrow Analysis is consistent with RESPA and Regulation X.

### B. The Debtor's Objection to the Escrow Components of the Claim for Arrears

The Debtors' argument in support of her objection is easily dismissed.

The Debtor suggests that because New Rez offered no testimony in support of the escrow components of the Arrears Claim, those components should be disallowed. (Debtor's Memorandum at 1-2). This argument fails to take into account the allocation of evidentiary burdens in an objection to a proof of claim.

In Sacko, 394 B.R. at 100–01, I held that if the underlying mortgage and note are attached to the proof of claim, Rule 3001(f) is satisfied and that documentation supporting specific charges that the loan documents authorize the lender to assess against the borrower need not be attached to the proof of claim for the claim to attain prima facie status. In that situation, the party objecting to the proof of claim has the initial burden of producing evidence negating the validity of the charge.

In this case, the documents attached to the Arrears Claim and the Mortgage indisputably obligates the Debtor to make escrow payments as part of her regular monthly mortgage

---

[5] This is where Rodriguez comes into play. Rather than requiring the Debtor to pay the escrow shortage all at once or by increased monthly payments in the twelve (12) months following the commencement of the bankruptcy case, Rodriguez holds that the escrow shortage is a prepetition claim that may be treated over life of the Debtor's chapter 13 plan. As a result, when the tax disbursements are made in the first year of the chapter plan, the escrow account will, in fact, go negative. The bankruptcy court and the dissent in Rodriguez believed that such a result was inconsistent with RESPA. The panel majority in the Court of Appeals held that the Bankruptcy Code's broad definition of claim was the decisive legal principle.

payments. New Rez's asserts in the Arrears Claim that the Debtor has not fully paid her escrow obligation and its proof of claim includes evidentiary matter in support of that position. Following Sacko since the Debtor has not offered any evidence to negate New Rez's calculation, Therefore, I reject the Debtor's argument that the Claim is insufficient due to the introduction of additional evidence.  It is the Debtor who failed to satisfy her burden of production under Allegheny Int'l., 954 F.2d at 173–74.

### C.  The Attorney's Fees Component of the Claim ($450.00)

Finally, I address the $450.00 claim for attorney's fees that New Rez incurred in the Debtor's prior bankruptcy case to obtain court approval of a loan modification.

The Debtor contends that the charge is not recoverable because New Rez presented no evidence of a default that would justify imposition of the charge.  However, the Debtor overlooks the fact that the Mortgage allows for fee-shifting in situations other than default and foreclosure.

Section 9 of the Mortgage provides:

> **9.  Protection of Lender's Interest in the Property and Rights under this Security Agreement**.  If . . .  (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument . . .  **such as a proceeding in bankruptcy** . . .  then Lender may do and pay for whatever is reasonable and appropriate to protect Lender's interest in the Property and rights under this Security Instrument . . . .  Lender's actions can include . . . paying reasonable attorney's fees to protect its interred in the Property and/or rights under this Security instruments, **including its secured position in a bankruptcy proceeding**."  (emphasis added)

I find that this provision is sufficiently broad to cover the attorney's fees incurred by New Rez in obtaining bankruptcy court authorization so as to protect its secured position when it agreed to modify the Debtor's loan during the course of the Debtor's prior bankruptcy case.

-15-

Therefore, I will allow the $450.00 component of the proof of claim.[6]

## VI.  CONCLUSION

For the reasons stated above, I will overrule the Debtor's Objection to New Rez's proof of claim for prepetition mortgage arrears.

Date:  April 14, 2021

ERIC L. FRANK
U.S. BANKRUPTCY JUDGE

---

[6]  The Debtor also complains that New Rez did not submit attorney time records in support of the requested attorney's fee allowance.  New Rez belatedly attempted to do so by attaching an invoice as an exhibit to its post-hearing memorandum.  (See Doc. # 83).  This attempt to supplement the record after the conclusion of the evidentiary hearing was improper and I have not considered the untimely exhibit.  However, even without supporting evidentiary matter, I am satisfied that the $450.00 attorney's fee for the motion New Rez filed in the Debtor's prior bankruptcy case is reasonable.

-16-